# United States Court of Appeals

## For the First Circuit

No. 13-1741

SANDRA L. HICKS,

Plaintiff, Appellant,

v.

JEH CHARLES JOHNSON,[*] SECRETARY,
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Richard B. Reiling for appellant.
Christine J. Wichers, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

June 20, 2014

---

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Jeh
Charles Johnson has been substituted for Janet Napolitano as
Secretary of the Department of Homeland Security.

**LIPEZ, <u>Circuit Judge</u>**.    Sandra Hicks brought this employment discrimination action against the Secretary of Homeland Security, claiming that the Secretary failed to promote her to the position of Housing Manager in the United States Coast Guard Housing Office at Air Station Cape Cod on account of her race and gender.    The district court granted the Secretary's motion for summary judgment, finding that Hicks failed to generate a genuine issue of material fact on the Secretary's non-discriminatory reason for choosing another candidate.    Prior to granting summary judgment, the court also denied Hicks's motion to reopen discovery.

In response to Hicks's appeal, we conclude that the district court did not abuse its discretion in denying Hicks's motion to reopen discovery.    We also agree that Hicks failed to generate a genuine issue of material fact on the issue of pretext. We therefore affirm.

## I.

Hicks, an African-American woman, has been a civil service government employee for over twenty years.    A majority of her service has been in the United States Coast Guard Housing Office at Air Station Cape Cod, located on the Otis Air Force Base. The Housing Office staff consists of one Housing Manager and approximately six subordinates.    Before the events at issue here took place in 2009, Hicks had served nine years in the Housing Office in two roles--six years as Housing Management Assistant and

three as Off-Base Housing Management Specialist.  The General

Schedule ("GS") levels of those positions were GS-07 and GS-09

respectively.[1]

In late 2009, Hicks's supervisor, Evelyn Norton,

announced her retirement from the Housing Manager position.  The

official job posting for Norton's replacement listed, among others,

the following required qualification:  "one year of specialized

experience equivalent to at least the GS-09 level or Ph.D or

equivalent doctoral degree or 3 full years of progressively higher

level graduate education leading to such a degree."  A list was

compiled of the candidates eligible for merit promotion to the

position.  The top two candidates were Hicks and Terry Krout, a

white man who was serving in the same office as a "housing

inspector."  Krout was a retired Chief Warrant Officer in the

---

[1]      The General Schedule (GS) classification and
         pay system covers the majority of civilian
         white-collar Federal employees (about 1.5
         million worldwide) in professional, technical,
         administrative, and clerical positions. . . .
         Each agency classifies its GS positions and
         appoints and pays its GS employees filling
         those positions following statutory and [U.S.
         Office of Personnel Management] guidelines.

         The General Schedule has 15 grades--GS-1
         (lowest) to GS-15 (highest).  Agencies
         establish (classify) the grade of each job
         based on the level of difficulty,
         responsibility, and qualifications required.

U.S. Office of Personnel Management, *General Schedule Overview*,
available at http://www.opm.gov/policy-data-oversight/pay
-leave/pay-systems/general-schedule/ (last visited June 16, 2014).

United States Coast Guard who had entered civil service in 2002. When the Housing Manager position became available in 2009, Krout had been serving as a GS-09 Housing Specialist for approximately one-and-a-half years. His primary responsibility in that position was inspecting 330 on-base housing units.

A panel consisting of Coast Guard Commander Paul Rendon, Area Housing Officer Kevin Sullivan, and Director of Morale, Wellbeing, and Recreation Bruce Blackman was charged with making a recommendation to Commander John Newby,[2] who would ultimately make the promotion decision.[3] The panel interviewed the top two candidates--Hicks and Krout. During the interviews, the candidates were asked the same twenty questions,[4] and the interviewers independently scored the interviewees' answers to each question on

---

[2] Both Paul Rendon and John Newby hold the rank of commander in the United States Coast Guard. Commander Rendon served as the Public Works Officer on base and reported to Commander Newby who was the Executive Officer.

[3] It is undisputed that Commander Rendon, on behalf of the panel, "selected" a candidate to be promoted and Commander Newby "approved" that selection.

[4] One of the questions asked, which is indicative of the type that comprised the interviews, was as follows:
    We work as a team in this office. What is your definition
    of the word 'team' and in conjunction with this what do
    you consider to be your greatest personal strength? On
    the flip side what work skill or personal quality do you
    feel requires further development?
Hicks characterized this question as asking for a "strength" and a "weakness." In her deposition she took issue with Commander Rendon's tone of voice in asking it and with the subject matter, suggesting that it alluded to an "inference to my race as being weak." As noted, this question was asked of both candidates.

a 1-3 scale (with 3 being the highest).[5] The scores for all of the questions were then added up to produce total interview scores for each candidate. The result was a split decision. Commander Rendon scored the interview for Krout by a margin of 54-48. Sullivan scored the interview for Hicks by a margin of 50-49. Blackman scored the interview for Krout by a margin of 45-44. Tallying all these scores, Krout had 148 and Hicks 142. On that basis the panel recommended Krout for promotion. Commander Newby adopted that recommendation.

Commander Rendon met with Hicks in person to communicate the promotion decision and discuss the reasoning behind it. Hicks was understandably disappointed, and she was offended by Commander Rendon's suggestion that she should have practiced her interview skills beforehand. After exhausting her administrative remedies, Hicks commenced this action on August 25, 2011, alleging that she was discriminated against on the basis of race and gender.

After proceeding pro se through the discovery period, Hicks retained Attorney Richard Reiling, who entered an appearance on January 31, 2013, on the eve of the deadline for responding to the Secretary's motion for summary judgment. Hicks also moved on that same date to reopen discovery pursuant to Rule 56(d) or, in the alternative, to extend the summary judgment opposition deadline

_____

[5] Despite being asked the same questions, Hicks's interview lasted one hour and forty minutes while Krout's lasted only forty minutes.

by 21 days.  On February 5, having heard oral argument from the parties, the district court issued the following order:  "The court will not reopen discovery but, in order to give plaintiff's counsel sufficient time to familiarize himself with the case and prepare a response, will extend by 21 days the deadline to oppose defendant's motion for summary judgment."

After obtaining an additional extension, Hicks filed her opposition to summary judgment on March 1.  The district court granted the defendant's motion for summary judgment in an order dated May 10, 2013.  This appeal followed.

## II.

### A. Standard of Review

Our review of a denial of a Rule 56(d) motion recognizes the "broad [and] . . . considerable discretion" of the district court over such matters. Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996).  We reverse denials of Rule 56(d) motions "only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 137-38 (1st Cir. 2001) (internal quotation mark omitted).

Our review of a district court's grant of summary judgment is de novo.  Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013).  In conducting our "fresh look" at the record, we

view the evidence in the light most favorable to the non-moving party, Hicks, and draw all reasonable inferences in her favor. Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013). Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Gerald, 707 F.3d at 16. To determine whether a trial-worthy issue exists, we look to all of the record materials on file, including the pleadings, depositions, and affidavits. Fed. R. Civ. P. 56(c)(1)(A); Johnson, 714 F.3d at 52. We may neither evaluate the credibility of witnesses nor weigh the evidence. See Sheehan v. N. Am. Mktg. Corp., 610 F.3d 144, 149 (1st Cir. 2010).

## B. Denial of 56(d) Motion

Rule 56(d) allows, in certain circumstances, for supplemental discovery after a motion for summary judgment has been filed. See Fed. R. Civ. P. 56(d). We have previously cautioned that Rule 56(d) relief is not to be granted as a matter of course. Ayala-Gerena, 95 F.3d at 92. As we have explained:

> To benefit from the protections of Rule 56[(d)], a litigant ordinarily must furnish the nisi prius court with a timely statement -- if not by affidavit, then in some other authoritative manner -- that (i) explains his or her current inability to adduce the facts essential to filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicates how those facts would influence the outcome of the pending summary judgment motion.

<u>Velez</u> v. <u>Awning Windows, Inc.</u>, 375 F.3d 35, 40 (1st Cir 2004).  In addition, the movant must "set forth good cause to explain [her] failure to have conducted the desired discovery at an earlier date."  <u>Mass. Sch. of Law at Andover, Inc.</u> v. <u>Am. Bar Ass'n</u>, 142 F.3d 26, 44 (1st Cir. 1998).

Even upon submission of the required materials, the district court is entitled to refuse a Rule 56(d) motion if it concludes that the party opposing summary judgment is unlikely to garner useful evidence from supplemental discovery. <u>See</u> <u>FDIC</u> v. <u>Kooyomjian</u>, 220 F.3d 10, 15 (1st Cir. 2000); <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 202 n.15 (1st Cir. 1999).

Hicks's decision to seek supplemental discovery shortly after retaining counsel is understandable.  As a pro se litigant, she likely had little understanding of the discovery process and had not conducted any depositions.  The Secretary had already made affidavits from Commander Rendon, Commander Newby, Blackman, and Sullivan part of the record at the time of her motion, as well as a significant amount of documentary evidence.  Specifically, in addition to requesting an opportunity to conduct depositions of those individuals, Hicks sought to depose Krout, who was awarded the position over her, and Norton, her former supervisor.  Neither of those individuals were involved in the decision-making process on the promotion at issue.  Hicks did not specify the evidence that she expected to obtain from any of this additional discovery.

-8-

Hicks's request to reopen discovery came late in the process. She also sought vague information from deponents, some of whom were not even relevant to her case. Furthermore, it is far from clear that the requested depositions of the decisionmakers would yield any useful information beyond what was in their affidavits. The district court, while sympathetic to Hicks's situation, acted within the bounds of its discretion in concluding that the additional discovery sought would not alter the summary judgment landscape and that simply granting an extension to the opposition deadline was sufficient to account for the fact that Hicks had been proceeding pro se.

## C. Summary Judgment

Where, as here, a claim of discrimination under Title VII rests on circumstantial evidence, we apply the burden-shifting analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973), to help "sharpen the inquiry into the elusive factual question" of the employer's motivation. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.8 (1981); see also Johnson, 714 F.3d at 53-54. Under that framework, if the plaintiff establishes a prima facie case of discrimination, an inference of discrimination arises, and the burden of production shifts to the defendant to produce evidence that the challenged employment action was taken for a legitimate, non-discriminatory reason. Johnson, 714 F.3d at 53-54. If the employer supplies such evidence, the plaintiff is left with

-9-

the burden to prove "by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Id. at 54; see also Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013).

Here, the Secretary concedes that Hicks has established a prima facie case of race and gender discrimination.[6] The Secretary contends, however, that the decision to promote Krout rather than Hicks was motivated by a non-discriminatory reason: their performance in the interviews. Specifically, the Secretary maintains that the undisputed fact that two of the three interviewers scored Krout higher was the dispositive factor in the promotion decision. According to Commander Rendon, the recommending panel based its selection solely on the interview scoring.

The district court found that Hicks failed to generate a genuine issue of material fact as to whether that proffered reason was pretextual. On appeal, Hicks points to four strains of

---

[6] As the district court noted, "a generous reading of the entire charge includes a claim of gender discrimination." However, the court focused its analysis on the race issue. The briefs on appeal take the same approach, prompting us to focus only on the race discrimination issue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The claim of gender discrimination also appears weak in light of the undisputed fact that three of the previous four housing managers had been women.

evidence that she contends were sufficient to create a genuine issue of material fact on the question of pretext.

### 1. Differences in Qualifications

Hicks focuses primarily on the alleged differences between her qualifications and Krout's. See Burdine, 450 U.S. at 259. The Secretary responds with evidence that the interviewers saw Hicks and Krout as essentially equally qualified, and therefore based the promotion decision exclusively on their relative performance in the interviews.

Hicks begins with a technical argument that Krout did not qualify for the position. Therefore, even interviewing him, let alone promoting him, indicated a questionable motive. This argument cites the language of the job posting, which stated that "[a]pplicants must have one-year of specialized experience" at the GS-09 level.[7] The posting went on to define "specialized experience" as "experience in the field of housing management that required application of a variety [of] general business principles and practices concerning the purchase, lease, rental, and overall utilization of housing facilities."

Hicks contends that because Krout served only as a housing inspector in his prior position, he lacked the requisite

---

[7] It is undisputed that although Hicks and Krout had different responsibilities in their prior positions, they had the same formal job title and GS level--Housing Specialist, GS-09. Accordingly, they both met the part of the experience requirement calling for at least one year of service at a GS-09 level.

leasing experience to fulfill the requirement. It is undisputed that as a housing inspector Krout was responsible for inspecting more than 330 on-base units at Otis Air Force Base; he was not responsible for the leasing or purchasing of those, or any other, housing units.

Hicks's argument is premised on an overly narrow interpretation of the "specialized experience" requirement. That requirement is not stated so precisely that experience with the "overall utilization of housing facilities" would be disqualifying if it did not happen to include direct experience with leasing. The requirement gives discretion to decisionmakers to evaluate whether a candidate's previous "experience in the field of housing management" was relevant. Indeed, if Hicks's narrow reading were correct, she would not have been qualified for the position because she lacked direct experience purchasing housing facilities.[8]

Hicks further contends that even if Krout were technically qualified for the position, his experience and qualifications were so inferior to hers as to permit a reasonable jury to infer discrimination in the decision to interview him and, ultimately, to promote him over her.[9] She asserts that given this

---

[8] Hicks avers that her specific responsibilities included inspecting housing units; obtaining and administering leases for Coast Card service members; and locating new properties for the Coast Guard to lease as additional housing.

[9] Hicks appears to use her superior qualifications argument in two ways. She asserts that her qualifications were so superior to

-12-

disparity, the interviewers' contention that they viewed the two candidates as equally qualified for the promotion could not be credited by a reasonable fact-finder.  We disagree.

The Supreme Court has acknowledged that "qualifications evidence may suffice, at least in some circumstances, to show pretext."  Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (emphasis added).  We have nonetheless cautioned that "subjective evidence of competing qualifications seldom provides a principled way for a factfinder to determine whether a given employment decision, even if wrong-headed, was anything more than 'a garden-variety mistake in corporate judgment.'"  Rathbun v. Autozone, Inc., 361 F.3d 62, 74 (1st Cir. 2004) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988)); see also Burdine, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be

---

Krout's that he should not even have been interviewed.  She also asserts that her slightly weaker performance in the interview should not have affected the promotion decision because her qualifications were so superior to his.  For our purposes, it is not material whether the decisionmaker considered their relative qualifications before, after, or throughout the interview.  Having established that both candidates were technically eligible for the promotion, the decisionmaker was free to consider their relative qualifications at any stage in the decision process.  Accordingly, we will focus the remainder of our analysis on the merits of Hicks's argument about the disparity in their qualifications without parsing out the decision to interview from the decision to promote.

probative of whether the employer's reasons are pretexts for discrimination.").

It is true that Hicks had more years of experience in the housing office (nine years) than did Krout (one-and-a-half years). Her particular experience in the management of housing unquestionably surpassed his. However, Krout had more years of total government service (31 years) than Hicks (20 years). Furthermore, the vast majority of Krout's government service was as a Chief Warrant Officer in the United States Coast Guard. That position required him to manage the contracting office of the ship or base where he was serving, supervise as many as twelve subordinates and oversee budgets as large as $15 million. As part of this role he evaluated and awarded supply contracts.

Weighing the value of this management experience against Hicks's housing management experience required the interview panel to make a judgment that it was entitled to make. Hicks's own view that her qualifications were superior to Krout's has little probative value. As the district court aptly put it, "no reasonable jury could conclude that Hicks's qualifications so outweighed those of Krout – hers were superior in some respects, but Krout's were superior in others – that it was more likely than not, discriminatory animus provided the job clincher." Hicks v. Napolitano, No. 11–11517–RSG, 2013 WL 1992204, at *4 (D. Mass. May 10, 2013). If the interviewers erred in judging the candidates'

relative qualifications, as Hicks argues, there is nothing to suggest that the error was anything but a permissible "garden-variety mistake in corporate judgment." Freeman, 865 F.2d at 1341.

## 2. Reliance on Subjective Interview Questions

Hicks argues that the panel's reliance on "subjective" interview questions -- clearly the tie-breaker in this case -- provided a "ready mechanism for discrimination" and is therefore evidence of pretext. This argument is misguided. It is true that the subjectivity necessarily introduced by the interview process can mask discrimination. Cf. Keyes v. Secretary of the Navy, 853 F.2d 1016, 1026 n.12 (1st Cir. 1988) (noting that "[e]valuating an applicant at an interview is a highly subjective exercise"). We have nonetheless declined, for good reason, to invalidate reliance on interviews in hiring decisions. See, e.g., Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 76 (1st Cir. 2011) (affirming an award of summary judgment to the employer when the promotion decision was based, in large part, on the assessment that one candidate "did exceptionally well during the interview" (internal quotation marks omitted)).

Here, the Coast Guard took pains to standardize the interview process, as well as record and quantify the candidates' performance on a uniform scale. The same twenty questions were asked of both candidates, and, as the district court remarked, they

-15-

were "so broadly worded as to provide an interviewee with ample running room to tout her qualifications and experience."   In essence, the Coast Guard made the subjective part of the promotion process as objective as possible, taking much of the ultimate discretion away from the interviewers.  We are not suggesting that such measures are required to immunize an interview process against charges of discrimination.  However, on this record, these measures do preclude any reasonable inference that the interview process was evidence of pretext.

### 3.   Lack of African Americans in Supervisory Positions

Hicks attempts to show pretext by pointing to the lack of African-American workers and managers at Air Station Cape Cod.  See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (holding that evidence of discriminatory animus may also serve to prove pretext).  Such historical evidence may inform the jury's evaluation of the decisionmakers' actions.  Here, however, the historical evidence is so limited that it does not permit a reasonable inference of discrimination.  There is no evidence that any other African American ever applied for the position sought by Hicks.  The housing office at the base did not employ a large staff -- seven total employees.  The fact that Hicks was the only African American in the group, without more, does not establish a genuine issue of material fact as to discriminatory animus within the office.  Furthermore, there is no evidence as to

-16-

the number of African Americans working on the base in general or their opportunities for advancement. This meager record simply does not permit any reasonable conclusion about a disparity between the opportunities for African Americans and whites at the Air Station Cape Cod, let alone the housing office.

### 4. Alleged Comments about Race

In an attempt to show pretext with evidence of discriminatory animus, Hicks cites a statement attributed to her former supervisor, departing Housing Manager Norton, describing Hicks as an "angry black woman." However, it is undisputed that Norton took no part in the promotion decision. Accordingly, this evidence does nothing to establish a genuine issue of material fact as to whether the promotion decision was motivated by anything other than Krout's documented scoring edge in the interviews.

### III.

The district court's denial of the Rule 56(d) motion to reopen discovery was not an abuse of discretion. The Secretary is entitled to summary judgment.

Affirmed.